

**SIGNED this 15th day of April, 2014.**

_____
**TONY M. DAVIS
UNITED STATES BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ROBERT L. HECKLER and | § | No. 13-10255 |
| RUTH H. HECKLER, | § | |
|     Debtors. | § | Chapter 7 |
| | § | |
| | § | |
| | § | |
| PLITT INTERNATIONAL, LCC, | § | |
| WEST END LIGHTING LLC, ROBERT | § | |
| WEBER, and JEFFREY PLITT, | § | |
|     Plaintiffs, | § | |
| | § | Adv. Proc. No. 13-01077 |
| v. | § | |
| | § | |
| ROBERT L. HECKLER and | § | |
| RUTH H. HECKLER, | § | |
|     Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    In this case, the Court must determine whether the debtors must be denied a discharge of

prebankruptcy debts because less than a year before filing for bankruptcy they transferred some

1

of their assets in order to "hinder, delay, or defraud" their creditors.

Trial was held in this matter on January 15 and 16, 2014. The parties presented post-trial briefs, and closing arguments were heard on March 21, 2014. The Court has carefully considered the submissions of the parties, the evidence admitted, the testimony provided, and the relevant law.

I. **JURISDICTION AND CONSTITUTIONAL AUTHORITY**

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(J). The Court has constitutional authority to enter a final judgment because this non-dischargeability action was not "the stuff of traditional actions at common law tried by the courts at Westminster in 1789," *Stern v. Marshall*, 131 S.Ct. 2594, 2609 (2011) (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982)), and the causes of action under dispute "flow from a federal statutory scheme," *Stern*, 131 S.Ct. at 2614.

II. **BACKGROUND**

A. **The Hecklers' Bankruptcy Filing**

Ruth and Rob Heckler filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code on February 8, 2013. Pl. Ex. 20 [Case No. 13-10255, Dkt. No. 1]. Ron Satija was appointed Chapter 7 trustee.

The Hecklers listed their combined average monthly income as $10,614. Pl. Ex. 20, Sch. I. They listed monthly expenses of about $500 less than that amount. *Id.*, Sch. J. They listed three secured creditors: one for the 2012 BMW that they purchased in August of 2012, one for the 2012 Buick Enclave purchased that same month, and then Mr. Heckler's parents, with whom the debtors had refinanced their home in March of 2012. *Id.*, Sch. D. The Hecklers listed only a

2

handful of unsecured debts. They declared consumer debts totaling less than three thousand dollars, and several debts relating to a failed business, West End Lighting, LLC ("West End"), with which the Hecklers had been involved. *Id.*, Sch. F. In addition to West End itself, an individual named Jeffrey Plitt and an entity named Plitt International were listed as creditors; their claims are both related to West End. *Id.* The largest listed debt was for a "guaranty" in the stated sum of $274,000 to Robert Weber, also a debt related to West End. *Id.*

### B. West End

Given the Hecklers' significant monthly income and otherwise manageable expenses, it seems clear that the numerous West End-related debts were the reasons for the bankruptcy filing. West End was a Texas company whose members (i.e., owners) were two other entities, Cedrela Consulting, LLC ("Cedrela") and Plitt International, LLC ("Plitt International"). Cedrela is a Texas company owned by the Hecklers, and Plitt International is a Wisconsin company owned by Jeffrey Plitt.

Plitt and Heckler formed West End in late 2009 to import and sell LED lights, which are more energy-efficient than other light sources, but also more expensive. Plitt and Heckler were both designated as Managers under West End's operating agreement. Def. Ex. 1. "Rob Heckler and Jeffrey Plitt each committed to spending the majority of their professional time working on behalf of WEL, with Rob Heckler overseeing the sales, financials and daily operations, and Jeffrey Plitt overseeing international sourcing and procurement of initial financing." First Am. Joint Pretrial Order ("Pretrial Order") [Dkt. No. 34], Ex. A, ¶ 8. West End's inventory, money, and records were kept in Texas with Rob Heckler. *Id.*, ¶ 9. An individual named Robert Weber agreed to loan the company several hundred thousand dollars pursuant to a loan agreement effective August 14, 2010. *Id.*, ¶ 6; Def. Ex. 15. Plitt and Heckler agreed they would be

3

personally liable for this debt, if West End failed to pay it. Pretrial Order, Ex. A, ¶ 6; Pl. Ex. 9.

West End was never profitable, although its revenue increased considerably over its relatively short life. Its 2009 tax return reflected no revenue and a net operating loss of approximately $2500, its 2010 tax return reflected revenues of just over $100,000 and a net operating loss of just under $50,000, and its 2011 tax return reflected revenues of approximately $550,000 with a net operating loss of $43,463. *See* Pretrial Order, Ex. 9, ¶¶ 18-20. But its principals were essentially working for free, and eventually, for whatever reason, Heckler's enthusiasm waned. In January of 2012, Heckler informed Plitt that he wanted out of the company.

Plitt and Heckler could not reach mutually satisfactory terms for Heckler's departure, and they began a period of contentious negotiations. The trial and deposition testimony suggests that Heckler refused to cooperate with Plitt's attempts to continue West End's business; specifically, Heckler stopped making West End's payments on the Weber loan, refused to stock and sell lights, and also refused to turn over the inventory to Plitt. The emails, however, suggest that Heckler opposed continuing to operate the unprofitable business on grounds that he did not want it to get deeper into a hole or expose it to fresh warranty liabilities, Def. Ex. 12, although Heckler admits that his behavior was intended in part to build negotiating leverage and get all parties to the table for discussions. The best offer that he put on the table in this period was that he was willing to pay $50,000 to cover what he considered his portion of the Weber Loan as of that time; but as part of this offer, he was not willing to sign a non-compete agreement with West End. The $50,000 offer was based on Heckler's testimony that if the inventory owned by West End were liquidated in mid-2012, and combined with the cash on hand of West End, Weber's loan could have been paid down to $100,000.

4

Eventually, on March 12, 2014, Heckler and his company, Cedrela, brought suit against Plitt, Plitt International, and Weber, in Travis County District Court, seeking declaratory relief as as well as the appointment of a receiver. Pretrial Order, Ex. A, ¶ 13; Pl. Ex. 18. Plitt and West End brought counterclaims, which are apparently still live before the state court. Heckler finally resigned from West End on August 27, 2012. Pretrial Order, Ex. A, ¶ 4. As of that date, the parties agree that the balance owed on the Weber Loan was $274,309. *Id.*, ¶ 7.

Before trial in the state court, the Hecklers filed their bankruptcy petition. Plitt International and West End filed a proof of claim in the bankruptcy proceeding, claiming that Rob and Ruth Heckler owed them $2,995,356.47 as of the petition date. Pl. Ex. 23. For his part, Weber filed a proof of claim for $353,220.10, apparently the value of the Weber loan plus attorneys' fees he claims are owed him. *See* Pl. Exs. 10, 24.

### C. The TUTMA Transfers

Another set of facts are relevant to this case. These facts emerge from various moves the Hecklers made in their personal finances around the time the West End dispute came to a head and the state court complaint was filed, although the Hecklers argue that there is no relationship between the West End events and their movements in their personal finances.

As of February 1, 2012, the Hecklers had on deposit in available funds approximately $119,000. On March 5, 2012, the debtors transferred a total of $78,000 from their money market accounts at Randolph Brooks Federal Credit Union into TUTMA accounts for their minor children. *See* Pl. Ex. 8. On March 9, 2012, the debtors paid off their home equity loan with Randolph Brooks, refinancing with Mr. Heckler's parents. Trial Tr., 126-27, Jan. 16, 2014. They also funded two IRA accounts in early March. Trial Tr., 58-60, 127, Jan. 16, 2014. These actions were taken days before they filed their state court suit on March 12. As a result of these

5

transactions, by April 1, 2012, the Hecklers had available funds of approximately $22,000.

Later in 2012, the Hecklers withdrew funds from these TUTMA accounts and transferred them into accounts used for living expenses, vacations, and attorneys' fees. There was a total of $26,000 in withdrawals from an account in the name of Stephen Heckler in September of 2012, leaving just under $2500 in that account. Pl. Ex. 12. In October and November of that year, they withdrew a total of $15,000 from the account in the name of Nathan Heckler; in January and February of 2013, they withdrew a further total sum of $11,000 from that account, leaving just under $2200 in it. Pl. Ex. 12. Finally, in early 2013, they made withdrawals from their third son's account in the sum of $6000. Pl. Ex. 12.

Throughout this time period, the Hecklers made various large expenditures, including the purchase of the two new luxury vehicles mentioned above. They also took trips to New York and to Universal Studios in Florida. Trial Tr., 63, 65, Jan. 16, 2014.

### III.  ANALYSIS AND HOLDINGS

With that background in place, we can turn to this adversary proceeding. In their complaint, the plaintiffs sought relief under §§ 727(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code. Dkt. No. 1. In their post-trial brief, they added a claim for non-dischargeability under § 727(a)(4)(A). Pls.' Post-Trial Br. [Dkt. No. 43] at 3-5.

At trial, Robert and Ruth Heckler provided testimony, *see* Trial Tr., Jan. 16, 2014, as did Robert Weber and Jeffrey Plitt, *see* Trial Tr. [Dkt. No. 50], Jan. 15, 2014. An accountant, David Bailey, provided expert testimony for the plaintiffs, opining that the company was worth $2,780,000 as of December 31, 2011, but that its value had declined to zero as of September 30, 2012. *See* Trial Tr., 203-233, Jan. 15, 2014; Pl. Exs. 25, 26.

The Court announced some tentative conclusions at the end of trial, so as to encourage

6

settlement and to guide counsel in presenting their closing briefs and arguments. Trial Tr., 138-47, Jan. 16, 2014. Unfortunately, settlement was not in the cards, but counsel have presented excellent legal arguments and materials to guide the Court's consideration of the relevant issues. The conclusions offered at trial were (as stated) only tentative, and the Court has carefully considered the new materials that have been submitted as well as engaging in considerably more legal research. Nevertheless, the arguments and research have largely confirmed the Court's initial impressions.

### A. Section 727(a)(2)(A)

The discharge must be denied to Mr. and Mrs. Heckler under 11 U.S.C. § 727(a)(2)(A). As noted at trial, this result "seems pretty clear."

Under § 727(a)(2)(A), plaintiffs were required to show:

(1) The debtor transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed,

(2) Property of the estate,

(3) Within one year before the date of the filing of the petition,

(4) With intent to hinder, delay, or defraud a creditor or an officer of the estate.

The first three elements are not in dispute. Seventy-eight thousand dollars of the debtors' money, which would have been property of the estate, was transferred from the Hecklers' personal account and into TUTMA accounts in the names of their children. The transfer happened on March 5, 2012, which is less than one year before the filing of the bankruptcy petition.

The fourth element, intent, is where the contest was. The Hecklers flatly deny that they had any intent to hinder their creditors when they transferred the TUTMA funds. Rather, their

7

narrative is that in early 2012, because Rob Heckler was working at a lucrative new job, they had decided to put their financial house in order, and as part of that effort, they wished to begin saving for the college education of their children. *See, e.g.*, Trial Tr., 59-60, 134-35, Jan. 16, 2014. The Hecklers dismiss the importance of the West End litigation, claiming that they viewed it at most as a "$100,000 problem," as their counsel memorably put it, and thus a problem within their means to cure.

But the Hecklers' story is undermined by the facts in evidence concerning their behavior. Actual intent is required, and actual intent is often proven by circumstantial evidence. *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701-02 (5th Cir. 2013). Here, the circumstantial evidence overwhelms the Hecklers' version of the story. The factual circumstances as they existed *before*, *after*, and *contemporaneously with* the transfers are worth considering.

First, *before* the transfers: The Hecklers offered an account of their financial situation before the transfer that does not hold up. Ruth Heckler claimed that her and her husband's newfound interest in savings was motivated by a sudden feeling of prosperity that contrasted with a couple of years in which they had been "living on air." Trial Tr., 135, Jan. 16, 2014. She stated, "[w]e'd gone two years where nobody even got a new pair of shoes unless they really, really needed it because we were trying not to spend money." *Id.* at 134-35. But in fact, as emerged on cross-examination and as the Hecklers' financial records confirm, their version of "living on air" hardly involved worn and tattered shoes. To the contrary, during the time period Ruth Heckler was referencing, the Hecklers spent hundreds of dollars per month on a personal trainer, and otherwise led a lifestyle that consumed approximately ten thousand dollars a month in expenses. *See, e.g.*, Trial Tr., 125-26 ("Ballpark would be about $10,000 a month."), 136 (personal trainer/gym), Jan. 16, 2014. It is true that during this period, Mr. Heckler's main

8

business venture, West End, was not paying much, and that may well have caused the Hecklers stress, or even caused them to spend less than they might otherwise have. But evidence does not support the drastic change from constriction to plenty that Ruth Heckler implied in her testimony.

Second, roughly *contemporaneously with* the time of the transfers: Along with Jeffrey Plitt and their related companies, Rob Heckler was personally liable for a large debt to Robert Weber. A dispute concerning both this debt and the management and future of West End had been brewing for several months, and Rob Heckler brought a state court suit naming Plitt and Weber and related entities very shortly after the transfers. That the transfers occurred so closely in time to the initiation of the lawsuit is strongly suggestive of a concern about the ramifications of the West End dispute (and the related entanglements that continue to this day) for the Hecklers' personal finances. The Hecklers claim that they viewed the West End situation as a well-contained, "$100,000 problem." But this is not credible. The evidence shows that the dispute was by March of 2012 a messy and contentious one, involving not coolheaded business judgments but shattered dreams and poisoned relationships. Heckler was largely communicating with his formerly close partner Plitt through a lawyer and in anything but a friendly tone; Plitt too was deeply aggrieved, and Weber had retained counsel. Perhaps, handled differently, Heckler could have withdrawn from West End without significant financial and legal fallout, but by March it was clear that the split was going to be a messy one. That was the situation when the Hecklers made their transfers.

Third, *after* the transfers: The Hecklers' story is rendered even less plausible by a consideration of their financial circumstances after the transfers. While they claim they transferred the money to TUTMAs to save for college, in fact, only a few months later, the

Hecklers made large withdrawals from these accounts, not for college but for living expenses. In general, throughout 2012, they hardly evidenced any concern for building savings or maintaining their long-term financial stability: They purchased two pricey new vehicles and did not otherwise curb their spending habits.

In analyzing the Hecklers' intent in light of the facts discussed above, the Court is guided by the factors that have been laid out by the Fifth Circuit, including in the recent *Dennis* case. *Dennis*, 330 F.3d at 701-02. *Dennis* mentions six factors that should be analyzed in determining actual intent to defraud under § 727 (a)(2)(A):

> (1) the lack of or inadequacy of consideration;
> (2) the family, friendship, or close relationship between debtor and transferee;
> (3) the retention of the possession, benefit, or use of the property in question;
> (4) the financial condition of the party sought to be charged before and after the transaction at issue;
> (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors; and
> (6) the general chronology of events and transactions under inquiry.

*Dennis*, 330 F.3d at 702 (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)).

These factors can be applied to the Hecklers' case as follows:

(1) There was no consideration paid—the transfers were a gratuity.

(2) The transfers were made to family members, the Hecklers' sons.

(3) The Hecklers used the funds for their living expenses, thus retaining the benefits and use of the property.

(4) While Rob Heckler's earnings had increased, improving the Hecklers' financial condition, the risk of litigation costs and exposure to liability loomed large at this

10

point. And the Hecklers appear to have intentionally lowered their amount of non-exempt property accordingly.

(5) The timing of the transfers must be considered in light of the West End problems that were looming when the transfers were made.

(6) The general chronology, with the timing of the lawsuit and the West End problems, is suggestive of an intent to shelter assets from creditors.

Viewed in this light, every one of the factors supports the plaintiffs. As Judge Houser has noted, "[a]ny of these factors alone may be sufficient to find an intent to hinder, delay, or defraud creditors; 'the accumulation of several factors indicates strongly that the debtor possessed the requisite intent.'" *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 588-89 (Bankr. N.D. Tex. 2006) (quoting *FDIC v. Sullivan (In re Sullivan)*, 204 B.R. 919, 941 (Bankr. N.D. Tex. 1997)). The factors support the plaintiffs' version of events. Less tangibly perhaps, but importantly, in light of their demeanor and the totality of their testimony, the Court simply found the Hecklers' statements concerning their intent unconvincing and not credible.

All of this is more than enough to assure the result of the section 727 cause of action. Even if it were not, there is a further step. *Chastant* teaches that intent should be presumed to be fraudulent when transfers are made gratuitously or to relatives. 873 F.2d at 91. Here, the transfers were made *both* gratuitously *and* to relatives. There is a long and clear line of case law supporting this presumption. *See, e.g.*, *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 698 (5th Cir. 2009); *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565-66 (5th Cir. 2005); *Compton v. Powers (In re Powers)*, 979 F.2d 1533, at *2 (5th Cir. 1992) (not designated for publication); *United States v. Harrison*, 366 B.R. 656, 659 (S.D. Tex. 2007). When the presumption applies, the burden of proof shifts to the debtor. *Duncan*, 562 F.3d at 698; *Pratt*, 411 F.3d at 565-66;

11

*Powers*, 979 F.2d at *3.

Needless to say, given the analysis above, the Hecklers by no means rebutted this presumption. Thus even if the factors, which are generally applicable, did not dictate this result, the presumption would do so.

For all of the reasons stated above, the Court holds that the Hecklers' discharge must be denied under § 727(a)(2)(A) of the Bankruptcy Code.

### B. The Section 523 Causes of Action

The plaintiffs claim that Rob Heckler committed fraud or defalcation by misappropriating West End money and property, and willfully and maliciously injured West End, all to the detriment of Plitt, Plitt International, and West End. They seek to have large sums of money deemed non-dischargeable debts of Rob Heckler. The factual underpinnings of these claims involve complex disputes of West End's corporate policies, for instance concerning how warranty claims were handled, how employees and contracters were compensated, whether funds were misappropriated for friends and family of Robert Heckler, and whether samples were to be retrieved from salesmen and other parties.

In contrast to the § 727(a)(2)(A) claim, the § 523 causes of action present numerous very difficult questions of both fact and law. The plaintiffs failed in many respects to convince the Court that harm was "wilfully and maliciously" caused, that Rob Heckler's mismanagement rose to the level of fraud or defalcation—or that there was a material injury. Most if not all of the plaintiffs' complaints about Heckler boil down to, at most, grievances over management proficiency and disagreements in strategy and emphasis, all in the context of an ill-defined relationship, the parameters of which were not reduced to writing. Plaintiffs' valuation expert provided an opinion of West End's value that seemed vastly inflated and unjustified—an opinion

that was essentially worthless, in the view of the Court.

There is precedent teaching that once a bankruptcy court has determined that discharge must be denied for one reason, it "does not need to decide the propriety of any of the other grounds" for denying the discharge. *In re DeVoll*, 266 B.R. 81, 98 (Bankr. N.D. Tex. 2001); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177 (5th Cir. 1992).

This case presents an excellent candidate for a decision not to decide. Even if the Court were to wade all the way in to the section 523 claims, there would still be related matters that could not be decided, and the parties would all be heading back to state court. The Court will therefore save everyone that intermediate step and send them back to state court right away.

### C. Section 727(a)(4)(A)

The Code provides that a debtor will not be granted a discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(a). Plaintiffs say this is another section violated by the Hecklers. Pls.' Post-Trial Br. at 3-5. At closing arguments, Plaintiffs conceded they had not pled this claim in their Complaint, but note that this would have been difficult or impossible anyway, because many of the statements were made at trial.

This claim was not pled, was not tried, and will not be decided by this Court. Especially in light of the clear § 727(a)(2)(A) finding here, there is no reason for the Court to consider this additional, belated cause of action.

### D. Liquidating the Claims

The Court sees no reason to go on to liquidate the claims of any party. Since there will be no discharge as a result of these bankruptcy proceedings, whatever claims exist against the Hecklers may simply be brought in due course as they would under non-bankruptcy law.

13

The one certain debt owed by Heckler is that asserted by Weber; but even that debt is complicated by the facts that Rob Heckler is at most jointly and severally liable on this debt with Plitt and with West End, and that there was a substantial sum in West End's coffers at the beginning of 2012 that arguably should have been paid to Weber, and that would have substantially diminished what is now owed. Further, while Weber may be entitled to attorneys' fees, it is not at all clear what fees are due, or that the Court can or should decide them. Counsel conceded at closing that the fees relating to enforcing the guaranty had not been segregated from the fees relating to pursuit of Plitt's damage claims. Thus, it is hard to see how any amount of the fees can be fairly charged to the guaranty claim. However, the Court believes the best course of action for now is to leave all of these matters to be resolved in state court.

## IV.    CONCLUSION

For the reasons stated above, the discharge must be denied to Robert and Ruth Heckler under § 727(a)(2)(A) of the Bankruptcy Code. This having been decided, the Court need not and does not determine the other causes of action presented here, nor does it liquidate any of the underlying claims of any of the parties to this adversary proceeding.

An order will issue to that effect.